## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

Tyler Trexler,

      Plaintiff,

    v.

City of Belvidere and Brandon Parker,

      Defendants.

Case No. 3:20-cv-50113

Honorable Iain D. Johnston

## MEMORANDUM OPINION AND ORDER

"Pow, fucking kicked him!" Officer Brandon Parker recounted to his supervisor. Dkt. 132 Ex. 2 at 1:01:50. Then, after explaining how he and Tyler Trexler ended up in the street, Officer Parker continued, "I got the dog here, I'm like, get it! Stellen!" *Id.* at 1:01:56. He laughed as he said that, drawing out the last syllable of the Dutch command that he used to sic his K-9 on Mr. Trexler. *Id.* As he finished his recap of what happened, an ambulance finally took Mr. Trexler away from the scene. Dkt. 130 ¶ 40.

The incident started about fifteen minutes prior. Officer Parker had stopped Mr. Trexler and his girlfriend, Morgan Vaughn, to investigate a potential curfew violation. Dkt. 120 ¶ 12. His car radio was tuned to 100 FM (Rockford's Greatest Hits), which was playing Tom Petty's 1989 classic from *Full Moon Fever*, "Free

Fallin." Dkt. 115-2 at 12:51:50-58.[1] As Officer Parker forcefully ordered Mr. Trexler and Ms. Vaughn to not move, Petty's voice can be heard finishing the verse right before the chorus ("I'm a bad boy for breakin' her heart"). *Id.* at 12:48:43. Seconds later, as the chorus started ("And I'm free"), Officer Parker brought his foot up and kicked Mr. Trexler. *Id.* at 12:48:48. Another two seconds ("Free fallin' . . ."), and Officer Parker ordered his dog to engage. *Id.* at 12:48:52. The video is shocking to watch.[2] So too are the other videos that show this wasn't a one-time occurrence.

Mr. Trexler brings this action against the City of Belvidere (the "City") and Officer Parker (collectively "Defendants") under 42 U.S.C. § 1983. Before the Court are two motions. Mr. Trexler moves for partial summary judgment on his excessive force claim as it pertains to Officer Parker's kick. Defendants, now comically insistent the "fucking kick[]" was actually a push with the foot, also move for summary judgment. For the following reasons, Mr. Trexler's motion is denied, and Defendants' motion is denied in part and granted in part.

---

[1] "Free Fallin"—the first track on *Full Moon Fever*—reached the top of Billboard's Mainstream Rock category in 1989. Shockingly, it only ranked number 219 on *Rolling Stone*'s 500 Greatest Songs of All Time.

[2] Only *Silence of the Lambs*' use of "American Girl" provides a more disturbing use of Tom Petty's music as a backdrop. Of all the Tom Petty and the Heartbreakers' songs Officer Parker could have taken guidance from that morning, "Don't Pull Me Over" from *Mojo* would have been the best choice. Tom Petty & The Heartbreakers, *Tom Petty and the Heartbreakers - Don't Pull Me Over (Video)*, YouTube (Jan. 31, 2011), https://youtu.be/i1C0RVfQGS4.

## I. Legal Standard

### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). If there is a video recording, the facts should be viewed "in the light depicted" by the video. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).[3] A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). However, "[s]peculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

---

[3] The purpose of video recordings is to capture and retain evidence of the interactions between law enforcement officers and citizens, which can be incredibly useful. *Dukes v. Freeport Health Network Mem. Hosp.*, No. 19-cv-50189, 2022 U.S. Dist. LEXIS 66453, at *2 n.1 (N.D. Ill. Apr. 11, 2022). Stunningly, even when clear video evidence exists, sometimes parties and their attorneys assert—even under oath—alternative facts. Officer Parker and his counsel have done so here, unfortunately.

### B. Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). Factual allegations "should not contain legal argument," and responses "may not set forth any new facts." LR 56.1(d)(4), (e)(2). "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.").

## II. Background

On August 9, 2018, around 12:48 AM, Tyler Trexler and his girlfriend, Morgan Vaughn, were walking down a sidewalk on the 700 block of Logan Street, Belvidere, Illinois. Dkt. 115 ¶¶ 8, 10; Dkt. 120 ¶ 2; Dkt. 127 ¶ 8. At the time, Mr. Trexler was twenty-four years old, and Ms. Vaughn was twenty-six. Dkt. 115 ¶ 10.[4]

---

[4] Defendants object to Ms. Vaughn's age. Defendants object because they seek to exclude Officer Parker's police report on the grounds that Mr. Trexler failed to authenticate the document. Dkt. 127 ¶¶ 7, 10. Defendants cite *Woods v. City of Chicago*, which states the general authentication requirement, but also holds that a district court has discretion to admit an arrest report without requiring authentication by affidavit. 234 F.3d 979, 988 (7th Cir. 2000). Defendants don't claim the report is inauthentic, and the exhibit contains

Brandon Parker, a police officer with the Belvidere Police Department, was on patrol. *Id.* ¶ 6. He saw Mr. Trexler and Ms. Vaughn, who he allegedly believed might be under the age of 18. *Id.* ¶¶ 8-9. To investigate this potential curfew violation,[5] he made a U-turn on Logan Boulevard, which is a main drag in Belvidere, to drive back toward them, turned into the entrance of a driveway, and parked with his car blocking the sidewalk. *Id.* ¶ 11; Dkt. 115-2 at 12:47:55-48:22; Dkt. 120 ¶¶ 12, 15; Dkt. 132 Ex. 1 at 12:50:06. As Officer Parker parked, Mr. Trexler looked around and slowed down to walk behind Ms. Vaughn. Dkt. 120 ¶¶ 2, 13. To confront these alleged curfew violators, Officer Parker exited his car with his K-9, Monti. Dkt 115 ¶ 13.

---

Defendants' Bates numbering, suggesting they produced the report in discovery. *See Lietzow v. Village of Huntley*, No. 17-cv-05291, 2023 U.S. Dist. LEXIS 65682, at *9-10 (N.D. Ill. Apr. 14, 2023); *see also United States v. Lawrence*, 934 F.2d 868, 871 (7th Cir. 1991) (finding that the production of a document in discovery is implicit authentication). It would be impractical to expect Mr. Trexler to seek an affidavit from the opposing party just to authenticate a document. *See Rodewald v. Wis. Cent., Ltd.*, No. 20-cv-843, 2022 U.S. Dist. LEXIS 46417, at *30 (W.D. Wis. Mar. 16, 2022) ("It is a waste of everyone's time to require parties to present witnesses solely for the purpose of authenticating documents to which the opposing party has no real doubt about their trustworthiness."); *see also Fenje v. Feld*, 301 F. Supp. 2d 781, 789 (N.D. Ill. 2003) ("[T]he opposing party is not acting in good faith in raising such an objection if the party nevertheless knows that the document is authentic."). The objection is overruled. Moreover, this objection is frivolous. First, are Defendants asserting that Mr. Trexler doesn't know the age of his girlfriend? Second, counsel have a professional obligation to stipulate to facts that are not reasonably disputed, and Defendants know and have access to Ms. Vaughn's age. Standards for Professional Conduct Within the Seventh Federal Judicial Circuit ("In civil actions, we will stipulate to relevant matters if they are undisputed and no good faith advocacy basis exists for not stipulating.").
[5] Under Illinois law, a curfew violation is minor, and it requires law enforcement officers to engage in specific actions before taking enforcement. 720 ILCS 5/12-60(c). For example, law enforcement must ask the apparent offender's their age and the reason for being in a public place. 720 ILCS 5/12-60(c). Officer Parker did neither of these before kicking Mr. Trexler and siccing his dog on Mr. Trexler. *See* Dkt. 115-2 at 12:48:40-52. The penalties for a curfew violation are minor, with some of the more onerous penalties being placed on the parent or guardian. 720 ILCS 5/12-60(e). A curfew violation can also be a local ordinance offense. 720 ILCS 5/12-60(f).

As he approached Mr. Trexler and Ms. Vaughn, Officer Parker opened with, "You guys look a little young to be out," followed by several commands for Mr. Trexler to take his hands out of his pocket. Dkt. 115-2 at 12:48:40-43; Dkt. 120 ¶¶ 2, 17.[6] Mr. Trexler initially refused; then, after he removed his hands from his pockets, he cupped his hands behind Ms. Vaughn's back, leaving Officer Parker unable to see if Mr. Trexler was holding anything. Dkt. 120 ¶¶ 2, 18, 32. Officer Parker, raising his voice, then ordered Mr. Trexler to not move. Dkt. 115 ¶ 17; Dkt. 115-2 at 12:48:44. Mr. Trexler lowered his hands slightly, but otherwise did not move. Dkt. 115-2 at 12:48:44-46; Dkt. 120 ¶ 19; Dkt. 127 ¶ 20.

At the same time, Officer Parker, holding Monti in one hand and a flashlight in the other, walked around Ms. Vaughn. Dkt. 115-2 at 12:48:44-46; Dkt. 120 ¶ 24. He lifted his right leg and kicked Mr. Trexler, his foot connecting with Mr. Trexler's right side and pushing Mr. Trexler away. Dkt. 115-2 at 12:48:47. As he put his foot down and while Mr. Trexler sailed through the air, Officer Parker yelled, "Fuck, don't move!" *Id.* at 12:48:48. Officer Parker also screamed both "Don't move!" and "Get on the ground!"[7] Mr. Trexler "pushed and pulled away from [Officer] Parker," and they "[b]oth fell to the ground when [Mr.] Trexler struck Officer Parker." Dkt.

---

[6] As discussed later in this opinion, the Court, bound by *Heck v. Humphrey*, 512 U.S. 477 (1994), reluctantly takes facts from Mr. Trexler's guilty plea as true, even if they contradict the videos. This is limited to the facts in the guilty plea; for other contradictory facts asserted by Defendants, the Court takes the version of events as depicted on video. *See Scott*, 550 U.S. at 380-81.

[7] With the classic question "You want I should freeze or get down on the ground?", *Raising Arizona* established that ordering someone to both move and not move are conflicting demands that can't be simultaneously complied with. *Raising Arizona* (Circle Films 1987); *Raising Arizona: "You Want I Should Freeze or Get Down on the Ground?"*, YouTube (Sept. 3, 2021), https://youtu.be/RCYtC1p6xbo.

120 ¶ 2. During the scuffle, Mr. Trexler opened his hands, revealing a controlled substance. *Id.*



Figure 1: Screenshots from Officer Parker's dashcam video depicting three seconds of Officer Parker approaching and kicking Mr. Trexler. Dkt. 115-2 at 12:48:45-47. (To make things clearer, the brightness and contrast of these images have been increased by 10%.)

*Four seconds* after kicking Mr. Trexler, Officer Parker then commanded Monti to bite Mr. Trexler. *Id.* ¶ 36; Dkt. 115-2 at 12:48:48-52. After the second time Officer Parker yelled the command, Mr. Trexler said, "Alright, I'm down." Dkt. 115-

2 at 12:48:54-55. Officer Parker then yelled, "Get on the ground!" *Id.* at 12:48:56.

Mr. Trexler exclaimed "I'm down" five more times before Officer Parker commanded

Monti to disengage, fourteen seconds after the initial command to engage. *Id.* at

12:48:58-49:06.[8] Officer Parker continued ordering Mr. Trexler to not move while

Mr. Trexler repeatedly replied with "I'm down" for another eight seconds before

Officer Parker gave a second command to Monti to disengage. *Id.* at 12:49:06-14.



Figure 2: A screenshot from another officer's dashcam video depicting
Officer Parker holding Mr. Trexler down while keeping Monti away.
Dkt. 132 Ex. 1 at 12:50:05.

Officer Parker used his knee to hold Mr. Trexler on the ground while keeping

Monti away with one hand. Dkt. 120 ¶ 40; Dkt. 130 ¶ 40; Dkt. 132 Ex. 1 at 12:50:06.

After another officer arrived at the scene, Officer Parker instructed Mr. Trexler to

roll around. Dkt. 132 Ex. 1 at 12:50:12-16. As Mr. Trexler raised his body to roll

over as ordered, Monti started toward him for another bite (without a command this

---

[8] For those unfamiliar with law enforcement nomenclature, "engage" means "bite."

time). *Id.* at 12:50:17-19. Officer Parker repeatedly ordered Mr. Trexler to stay on the ground and roll around. *Id.* at 12:50:19-24. The other officer stayed with Mr. Trexler as Officer Parker then took Monti back to his car. *Id.* at 12:50:25. After that, Mr. Trexler remained at the scene for over ten minutes before being taken to the hospital by ambulance. Dkt. 130 ¶ 40. During this time, Officer Parker debriefed the incident to the shift supervisor. Dkt. 120 ¶ 41. For reasons unexplained, Mr. Trexler later pleaded guilty in Illinois state court to aggravated obstructing and resisting a peace officer. *Id.* ¶ 2. He also pleaded guilty to unlawful possession of a controlled substance. *Id.* ¶ 2.

In August 2018, at the Belvidere Police Department (BPD), Shane Woody was the chief of police, Mathew Wallace was the deputy chief of operations, and Patrick Gardner was the deputy chief of patrol. *Id.* ¶ 55. Shift supervisors could bring uses of force to Deputy Chief Gardner for review, and he had advised them that he wanted to review uses of force greater than "soft-arm control." *Id.* ¶ 58. Deputy Chief Gardner typically didn't produce written reviews, unless directed by Chief Woody. Reviews and decisions about discipline were based on the totality of the circumstances. *See id.* ¶¶ 62-63, 65. BPD had two relevant policies for K-9 use of force: one for use of force and one for K-9 use. *Id.* ¶¶ 75-77.

The K-9 team fell under Deputy Chief Gardner's supervision, with Sergeant Daniel Smaha as the supervisor of the team. *Id.* ¶¶ 56, 70. Officers were required to maintain a K-9 activity log, which was accessible to supervisors. *Id.* ¶ 67. BPD also required a minimum of 24 hours of training per month for K-9 officers. *Id.* ¶ 54.

Officer Parker first received training and certification to become a K-9 officer in 2003 or 2004. *Id.* ¶ 51. He was a K-9 officer for the City until 2007. *Id.* ¶¶ 49. He then returned to the K-9 team (following a leave of absence) sometime in 2012. *Id.* ¶ 50; Dkt. 120-1 Ex. C at 59:2-5.

## III. Analysis

Title 42 U.S.C. § 1983 provides a cause of action against any person who, under color of a state's "statute, ordinance, regulation, custom, or usage" deprives any person of a right secured by the federal Constitution. 42 U.S.C. § 1983. Liability must be based on each defendant's knowledge and actions, *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012), which may include either direct participation in the "offending act," acting or failing to act with reckless disregard of someone's constitutional rights when under a duty to safeguard them, or allowing an offending act to occur with one's knowledge or consent. *Childress v. Walker*, 787 F.3d 433, 439-40 (7th Cir. 2015). Mr. Trexler brings three claims under the Fourth Amendment's protection against unreasonable seizures of a person.

### A. Unlawful Stop

Mr. Trexler has abandoned this claim because he declined to address Defendants' arguments on this issue, saying he "will not be bringing separate claims for an unlawful *Terry* stop." Dkt. 129 at 4 n.1. Summary judgment is granted as to this claim.

### B. Excessive Force

In the context of an arrest, excessive force claims are reviewed under the Fourth Amendment's reasonableness standard. *Cyrus v. Town of Mukwonago*, 624

F.3d 856, 861 (7th Cir. 2010); *Graham v. Connor*, 490 U.S. 386, 395 (1989). An officer's use of force is unreasonable if "the officer used greater force than was reasonably necessary to make the arrest." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)). "This inquiry requires an examination of the 'totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake.' " *Cyrus*, 624 F.3d at 861 (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000)) (alteration in original). The Seventh Circuit—and this Court's standing order on summary judgment—has cautioned that "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus*, 624 F.3d at 862; *Taylor v. City of Milford*, 10 F.4th 800, 811 (7th Cir. 2021).

This fact-intensive inquiry considers facts such as "the severity of the crime at issue, whether the person posed an immediate threat to the safety of the officers or others, and whether the person was actively resisting the officers." *Taylor*, 10 F.4th at 806-07 (quoting *Williams v. Ind. State Police Dep't*, 797 F.3d 468 472-73 (7th Cir. 2015)). Defendants don't dispute that the crime at issue—a potential curfew violation—is a relatively minor crime. Instead, Defendants argue that Officer Parker was justified in his actions because Mr. Trexler resisted arrest and posed a danger. Dkt. 137 at 9.

Mr. Trexler identifies three actions by Officer Parker that could be found as excessive uses of force: (1) Officer Parker's kick to Mr. Trexler, (2) his use of a K-9 to bite Mr. Trexler, and (3) his decision to allow the K-9 to remain "on bite" for longer than necessary. Dkt. 129 at 4. Before analyzing those actions, the Court must first address what *Heck v. Humphrey* bars in this discussion.

1. The Heck *bar*

*Heck v. Humphrey* bars a plaintiff from pursuing a § 1983 claim that "would necessarily imply the invalidity of his conviction or sentence." 512 U.S. 477, 487 (1994). "Conversely, if the civil action, even if successful, 'will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed.'" *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006) (quoting *Heck*, 512 U.S. at 487).

Defendants argue that Mr. Trexler improperly relies on facts that challenge the alleged facts from his plea agreement. Mr. Trexler has not contested the validity of his prior conviction, so he cannot "challenge the factual basis presented at his change of plea hearing." *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006). Mr. Trexler argues that although he was convicted on this factual basis, he did not admit to each factual allegation. Dkt. 129 at 6. During the change of plea hearing, the court did not ask Mr. Trexler to stipulate to the factual basis that was read into the record; Mr. Trexler merely affirmed that he still wished to plead guilty. Dkt. 130 ¶ 3. Mr. Trexler cites no authority for the proposition that this Court can then pick and choose which facts to take as true. He provides two examples where a defendant swore to or stipulated to the facts during a change of plea, but that alone

doesn't make Mr. Trexler's change of plea deficient—there is no requirement in Illinois, unlike federal court, that the defendant "personally stipulate to the factual basis for the plea." *People v. McIntosh*, 146 N.E.3d 813, 829 (Ill. App. Ct. 2020).

Illinois courts have held that the admission of facts by way of a guilty plea is limited to the facts that "constitute an ingredient of the offense charged." *People v. Henderson*, 419 N.E.2d 1262, 1265, (Ill. App. Ct. 1981); *People v. Gray*, 941 N.E.2d 338, 344 (Ill. App. Ct. 2010). But what Mr. Trexler asks this Court to do goes beyond merely excluding collateral facts with "no bearing on the elements" of the conviction. *Gray*, 941 N.E.2d at 473-74. By picking which acts of resistance were minimally sufficient to justify the charge of resisting arrest, Mr. Trexler asks this Court to sort between facts that all support the conviction. For example, that Mr. Trexler cupped his hands behind Ms. Vaughn's back and that he struck Officer Parker can both be seen as resisting a peace officer, and the plea agreement doesn't indicate that one of those factual allegations supported the conviction to the exclusion of the other. The Court proceeds by taking the factual allegations presented at Mr. Trexler's change of plea as true.[9]

---

[9] The Court acknowledges the bind that this puts Mr. Trexler in, the video evidence contradicts some of the factual allegations in the plea agreement. For example, Officer Parker asks Mr. Trexler to remove his hands from his pockets only twice, and Mr. Trexler complies after the second command; that is a far cry from "refus[ing] to take his hands out of his pockets after *several* commands." Dkt. 120 ¶ 2 (emphasis added). However, the Court could not find any authority stating that video evidence that contradicts the facts underlying a criminal conviction can overcome a *Heck* bar. The Court leaves for another day—with the benefit of fulsome briefing—the issue of whether *Heck*'s factual findings trump clear, undisputed video/audio evidence. For now, this Court takes the factual basis in Mr. Trexler's plea as true and abides by the legal fiction presented by Defendants' counsel.

In response to Defendants' arguments, the Court notes two limits to this *Heck* bar. First, factual allegations that could coexist with the version of the facts in the plea agreement are not barred by *Heck*. The Court has done its best to piece together a narrative that includes the facts in the plea agreement, the undisputed facts in the record, and the videos. Second, although *Heck* bars Mr. Trexler from putting forth certain facts, it does not bar the excessive force claim entirely. *McCann*, 466 F.3d at 621 ("As a general proposition, a plaintiff who has been convicted of resisting arrest or assaulting a police officer during the course of an arrest is not *per se Heck*-barred from maintaining a § 1983 action for excessive force stemming from the same confrontation.").

### 2. Officer Parker's actions

The Court then addresses what a reasonable jury could find in light of the facts, as limited by *Heck*. The first action by Officer Parker at issue is his kick to Mr. Trexler's side. Both sides argue they are entitled to summary judgment on the kick, so the Court must examine the situation from both angles.

Starting with the facts in light most favorable to Defendants, the kick[10] survives Mr. Trexler's summary judgment motion. Mr. Trexler has not shown that no reasonable jury could find a need for Officer Parker to physically separate Mr.

---

[10] Even looking at the facts in Defendants' favor, the Court finds no ambiguity to insist, as Defendants have done, that the kick is a push and not a kick. *See, e.g.*, Dkt. 136 ¶¶ 14, 19. Characterizing it as a "teep push kick," *see, e.g.*, *id.* ¶ 24, doesn't help either. Defendants don't define the term, and from what the Court has been able to glean, this Muay Thai kicking technique still yields a kick. *See* Christoph Delp, *Muay Thai Basics* 101 (2005). And remember, Officer Parker bragged to his supervisor: "Pow, fucking kicked him." Dkt. 132 Ex. 2 at 1:01:50. And the video removes any reasonable doubt: *It was a kick!*

14

Trexler from Ms. Vaughn based on the facts in the record—primarily, those required to be taken as true by *Heck*. Mr. Trexler had repeatedly refused to comply with Officer Parker's commands as he hid behind Ms. Vaughn with his hands cupped around something that Officer Parker could not see. The parties dispute whether Mr. Trexler moved his hands as he hid them; making reasonable inferences in Defendants' favor, it is possible to conclude that Mr. Trexler could pose a threat. It comes down to an interpretation of the facts, and the Seventh Circuit has stated that summary judgment should be granted sparingly in excessive force cases because "the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005).[11] Mr. Trexler comes close to turning this into "a pure question of law" in his favor, *see Scott*, 550 U.S. at 381 n.8, but Mr. Trexler's summary judgment motion is denied, primarily because of the facts required to be taken as true under *Heck*.[12]

On the flip side, after arguing that excessive force claims don't deserve summary judgment, Dkt. 128 at 8-9, Defendants change their tune and argue that there was no excessive force as a matter of law, Dkt. 137 at 8-9. In this context, the Court is now procedurally required to change hats and view the facts in the light

---

[11] Although the Court sometimes finds relevant wisdom in Tom Petty's lyrics, *see, e.g.*, *In re Deere & Co. Repair Serv. Antitrust Litig.*, No. 22-cv-50188, 2023 U.S. Dist. LEXIS 210516, at *69 n.30 (N.D. Ill. Nov. 27, 2023), the lyrical interpretation from Mr. Trexler's counsel, Dkt. 138 at 1-2, was insufficient to nudge this analysis.

[12] Because summary judgment is denied on the reasonableness of the kick, the Court does not address whether qualified immunity would be grounds for denial, as raised by the briefing on Mr. Trexler's motion for summary judgment.

most favorable to Mr. Trexler. *Kreg v. Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 416-17 (7th Cir. 2019); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015); *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2002). Looking at the facts in light most favorable to Mr. Trexler, a reasonable jury could easily find that Officer Parker used excessive force. Although Mr. Trexler had repeatedly refused to comply with commands and stood behind Ms. Vaughn holding an unknown object, he didn't pose any physical threat to Officer Parker or Ms. Vaughn before the kick. And remember the stop was allegedly for the insignificant offense of violating curfew. The alleged scuffle and strike happened after the kick—by the time of the kick, Mr. Trexler had removed his hands from his pockets, and he was standing still. Defendants dwell on the slight movement of his hands, which is almost indetectable on the video recording. But a reasonable jury could find that movement was more akin to blinking or breathing rather than an indication of physically resisting Officer Parker. A reasonable jury could also find no indication that Ms. Vaughn was in any distress when she and Mr. Trexler were walking down the sidewalk, and so there was no need to separate Mr. Trexler from Ms. Vaughn with such a forceful kick.

Then there is the question of the use of force with K-9 Monti. After Officer Parker kicked Mr. Trexler, the latter "pushed and pulled away"; they fell when Mr. Trexler struck Officer Parker. Dkt. 120 ¶ 2. But that amount of resistance doesn't mean no reasonable jury could find the use of the dog as excessive. When Officer Parker commanded Monti to engage, he and Mr. Trexler had fallen from a scuffle.

16

Mr. Trexler can be heard on video repeatedly saying "I'm down" when Monti was engaged; it would be a reasonable inference to conclude that Mr. Trexler was on the ground when Monti bit him because of Officer Parker's command. A reasonable jury could find that Officer Parker needlessly commanded Monti to bite a fallen man and that the length of time Monti was engaged was excessive.

### C. *Monell* Liability

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be liable for violating the Constitution or federal law. *Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022). First, there needs to be a deprivation of a federal right. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022). A plaintiff must then connect that deprivation of a constitutional right to a municipal action in the form of "(1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policy making authority." *Stockton*, 44 F.4th at 617. A municipality can also act by ratification. *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (7th Cir. 1992). Next, the plaintiff must show that the municipal action amounts to deliberate indifference. *Id.*; *Connick v. Thompson*, 563 U.S. 51, 51 (2011). And finally, the plaintiff must show that the municipal action was the "moving force" behind the constitutional injury. *Stockton*, 44 F.4th at 617.

As established above, Mr. Trexler has established a genuine dispute of fact as to whether there was a constitutional violation. The municipal action that he

alleges is a failure to train or supervise,[13] which "may be fairly said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020). A municipality can be liable for a failure to act without a pattern of constitutional violations when it is "so obvious" that there need to be protocols to address a situation. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 382 (7th Cir. 2017) (quoting *City of Canton*, 489 U.S. at 390 n.10); *J.K.J.*, 960 F.3d at 380-81.[14] Drawing from *City of Canton*, the Seventh Circuit has stated that "it is obvious that police officers would encounter situations where they would need protocols on the use of excessive force." *J.K.J.*, 960 F.3d at 381. This principle isn't limited to specific methods of using force; applying it to this case, it should be obvious that police officers would need guidance on excessive force, whether the use of force be kicking civilians, pinning them to the ground, or commanding a K-9 to apprehend them. This also creates a material dispute as to whether the City acted with deliberate indifference, *see Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003), and as to causation, *see Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409-10 (1997) ("[T]he high degree of predictability may also support an inference of causation.").

---

[13] Mr. Trexler appears to have abandoned his allegations of a code of silence among BPD officers and of officers preparing and filing false police reports.
[14] Defendants argue that the principle that liability can occur with a single incident when the constitutional violation is obvious applies only to failure-to-train claims and not failure-to-supervise claims, but the Seventh Circuit has applied cases like *City of Canton* and *Connick* to failure-to-supervise claims. *See, e.g.*, *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019).

Mr. Trexler's factual basis for arguing a failure to train is limited to the K-9 program. He asserts that there is no policy for K-9 handling during street stops or investigations, citing the deposition testimony of Deputy Chief Wallace. Dkt. 131 ¶ 44. Although there is no policy specific to street stops or curfew investigations, there are other policies that apply to such situations, such as the overall K-9 policy. Dkt. 136 ¶ 44. The second page of the policy says, "In no instance will the handler permit his canine to make an unjustified attack upon any person." Dkt. 120-1 Ex. M at 14121412. Defendants also point out that Mr. Trexler's expert thought highly of the K-9 policy. Dkt. 137 at 27; Dkt. 120 ¶ 78. In addition, Officer Parker underwent many hours of training and a certification process, Dkt. 120 ¶¶ 51, 54, and Mr. Trexler offers no evidence that other K-9 officers weren't trained. Based on this evidence, no reasonable jury could find a failure to train.

For the failure-to-supervise theory, however, the facts do create a genuine dispute. For example, Mr. Trexler's expert opines that eleven of Officer Parker's K-9 apprehensions were improper. Dkt. 131 ¶ 48. Defendants object to this because the expert did not opine on a constitutional standard, Dkt. 136 ¶ 48,[15] but even if all

---

[15] This objection is silly because an expert can't testify that a constitutional standard was not met. Defendants even repeatedly argued this point in their motion to bar Mr. Trexler's expert. Dkt. 96 at 7-9, 14-15. Throughout this litigation, Defendants' counsel has taken positions when they seem to benefit from them but take diametrically opposed positions when the prior positions no longer favored them. This is just one example. Arguing that summary judgment is inappropriate in excessive force cases—after moving for summary judgment in this excessive force case—is another example. They should stop doing this. Moreover, Defendants also object to the expert because they believe he relied only on some Loss Notice Reports for his opinion, but the expert report was also based on videos of incidents. Dkt. 130 ¶ 84; *see generally Abdullahi*, 423 F.3d at 772 (finding "even brief expert reports" sufficient at summary judgment).

eleven weren't constitutional violations, it still lends to the reasonable inference that there was a lack of oversight with Officer Parker's use of a K-9 during stops. *See Abdullahi*, 423 F.3d at 773. The earliest date in these eleven incidents is July 27, 2015. Dkt. 132 Ex. 8 at 22. That's three years during which BPD could have but didn't investigate improper and potentially unconstitutional K-9 use.

Mr. Trexler also presents evidence about processes and procedures more generally at BPD. K-9 officers are required to keep a log of all K-9 activities, which can include categorizing the nature of the K-9 use. Dkt. 120 ¶ 67. But they aren't required to document the duration of a K-9 bite during an apprehension. Dkt. 131 ¶ 46. Nor does the department track which K-9 has the most bites or what percentage of the time a specific K-9 bites people, which Mr. Trexler's expert opines falls below the industry standard. *Id.* ¶¶ 41-42. Defendants object to this evidence, arguing that there's no constitutional requirement to enforce certain standards of documentation and that uses of force are individually and holistically reviewed. But even if not dispositive, such evidence adds more details to the picture that Mr. Trexler paints of BPD's deficient supervision.

Furthermore, although it's undisputed that the logs are made available to supervisors, it is disputed whether the logs are reviewed. *See* Dkt. 120 ¶¶ 67-68; Dkt. 130 ¶ 68. Mr. Trexler points out that the K-9 team supervisor, Sergeant Smaha, lacks training on K-9 handling and supervision. Dkt. 129 at 15. Defendants don't dispute this, but they argue that Sergeant Smaha's role is purely administrative. Dkt. 137 at 26. Instead, the responsibility of reviewing K-9 uses of

force are the second highest ranking members of the department and former K-9 officers, Deputy Chiefs Wallace and Gardiner. Dkt. 137 at 26; Dkt. 120 ¶¶ 45, 56. But the record doesn't support Defendants' contention that Deputy Chief Gardiner reviewed K-9 use or had any responsibilities specific to the K-9 program. *See* Dkt. 130 ¶¶ 70-72. Nor do Defendants cite to a statement of fact that supports the assertion that Deputy Chief Wallace reviewed K-9 use. *See* Dkt. 121 at 15; Dkt. 137 at 26. What Deputy Chief Wallace reviews is uses of force that are brought to his attention by supervisors. Dkt. 120 ¶ 58. But a "Use of Force Review" for incidents from June 2018 to August 2020 omitted K-9 use of force incidents, and Deputy Chief Wallace did not know why those incidents had been excluded. Dkt. 132 Ex. 3; Dkt. 120-1 Ex. G at 46:14-19.

BPD also had no policies around, for example, tracking use of force incidents to compare between officers. Dkt. 131 ¶ 37. Defendants argue that BPD is small enough to render statistical analysis and "early warning systems" unnecessary, Dkt. 137 at 28, but that asks the Court to make an inference in Defendants' favor. Making inferences in Mr. Trexler's favor, this only underscores the reasonable possibility that there was a lack of supervision that allowed Officer Parker's missteps to continue, leading to the incident with Mr. Trexler in August 2018. A reasonably jury could easily find that in such a small department, the supervisors must have known of Officer Parker's problematic behavior, condoned it, and did nothing to stop it.

## IV.    Conclusion

Mr. Trexler's motion for summary judgment is denied. Defendants' motion for summary judgment is denied in part and granted in part. Summary judgment is granted on the unlawful stop claim and on the *Monell* theories alleging a failure to train, a code of silence, and preparing and filing false police reports. Summary judgment is denied on the excessive force claim and the *Monell* theory alleging a failure to supervise.

The parties should consult with each other to decide whether they would like to schedule a settlement conference with Magistrate Judge Schneider or whether they would like to prepare a final pretrial order. Counsel should file a notice with the Court by March 8, 2024, as to how they would like to proceed.

The Court cautions Defendants' counsel about the legal arguments and factual positions they have taken throughout this case, including in the summary judgment briefing.


Date: February 12, 2024

_____
Honorable Iain D. Johnston
United States District Judge